UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| RANDALL MCCOY, et al., | ) | |
|---|---|---|
| | ) | |
| Plaintiffs, | ) | Civil Action No. 08-112 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| JARED ALFREY, | ) | **& ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

"The distance between civilization and barbarity, and the time needed to pass from one state to the other, is depressingly short." *United States v. Bartlett*, 567 F.3d 901, 903 (7th Cir. 2009). Jared Alfrey, a trooper with the Kentucky State Police, proved just how short on the afternoon of July 3, 2007.

It was the day before the Fourth of July, and Alfrey was driving down the road in his police cruiser. A car coming toward him slowed down, its driver obviously flustered. The driver was Randall McCoy. McCoy, who had spent his entire career serving in the Army, flagged Alfrey down and asked for the trooper's help. His longtime girlfriend, Benita Damron, had just kicked him out of her house because she believed that he had been looking at pornography on the internet. Damron was so upset that she insisted McCoy leave immediately, before he could retrieve even his wallet or his duffel bag. McCoy and Damron had fought several times in the past and McCoy knew that she just needed some time to cool off. But he needed his wallet and his clothes to live for the next few days. McCoy asked Alfrey if he would accompany him back to the house so he could get a few essentials. Alfrey agreed and followed McCoy in his cruiser.

When they arrived back at the house, McCoy stayed outside while Alfrey went in to speak with Damron. He saw some evidence of an argument—a vase knocked to the floor, a phone ripped out of its jack. Alfrey told Damron that she would have to come with him. After she got dressed Alfrey handcuffed her, walked her outside, and put her in the cruiser. Alfrey handcuffed McCoy and put him the car as well. McCoy asked why he and Damron were being arrested. Alfrey did not answer. McCoy and Damron assumed that Alfrey was taking them to the police station. So they were surprised when he turned up a small and windy gravel road heading toward an abandoned mine site near Turkey Creek. McCoy asked again whether they were under arrest. Alfrey told him to shut up.

The mine site was desolate, the kind of place where no one can hear you scream. The mine itself had long since been sealed off. Weeds and overgrowth littered the gravel road. Alfrey stopped the car, pulled McCoy out, took off his handcuffs, and told him to put his hands on his head. McCoy complied, as unarmed men tend to do when they receive orders from armed men. Alfrey then smacked McCoy in the face. Once, twice, three times. The slaps broke the skin. Alfrey put the handcuffs back on McCoy, loaded him back into the cruiser, and drove back in the direction of civilization.

McCoy and Damron sat in stunned silence for a while as Alfrey drove. Alfrey stopped at a Mexican restaurant on Route 292. He went inside and made a phone call. When Alfrey got back into the car and continued driving toward the police station, McCoy started asking more questions. Why was he doing this? Don't police officers have a duty to serve and protect? McCoy also pleaded with Alfrey to let Damron go. She had just spent three days in the hospital

recovering from a nasty bite by a brown recluse spider. The area around the bite still looked like a shotgun blast and Damron was very weak. After listening to McCoy's protestations, Alfrey slammed on the brakes, turned the cruiser around, and headed back in the direction of the abandoned mine.

Alfrey drove up that overgrown gravel road, again, hauled McCoy out of the car, again, and told McCoy to put his hands on his head, again. This time, Alfrey left McCoy's handcuffs on. Alfrey reared back in preparation to throw a punch. McCoy told Alfrey that he would not allow him to hurt him again. He ducked out of the way of Alfrey's fist and grabbed Alfrey from behind, restraining him. While McCoy held Alfrey, the trooper began biting McCoy's arms. Damron was shrieking hysterically watching the scene unfold from inside the cruiser. Damron yelled at McCoy to let the trooper go. McCoy listened. He released his grip on Alfrey and started walking toward the cruiser.

McCoy then felt the cold metal of Alfrey's revolver press against the rear of his skull. Alfrey told McCoy to get on the ground, and he kicked McCoy in the knee to aide his descent. Alfrey kicked McCoy in the side and stomped on his back and neck repeatedly. Alfrey took out his Asp—a thirty-six inch metal rod—and struck McCoy again and again. On his back and on his side. Bruising his skin and forming massive welts. McCoy asked Alfrey to stop, but he would not. He just kept beating him in stone-cold silence. McCoy put up his arm to shield his head from Alfrey's blows. The Asp came down and shattered McCoy's watch—a gift his father had given him. Pieces of the shattered watch fell to the ground, mixing with the blood that was already splattered on the gravel. McCoy crawled back toward the cruiser and into the back seat

3

where Damron was still screaming like a banshee. But Alfrey was not done. Alfrey grabbed McCoy, took out his can of mace, and sprayed him directly in the eyeballs at point blank range. Some of the pepper spray ricocheted onto Damron's arms, burning her skin.

Nearly blind from the pepper spray, McCoy heard Alfrey slam the back door of the cruiser shut, get in the driver's seat, and start the engine. The gravel crunched under the tires as Alfrey drove back down the abandoned road. Alfrey said, "now I've got to take you to the damned hospital." He drove McCoy and Damron to the hospital, where McCoy received treatment for his wounds. McCoy and Damron were detained for several days by the Kentucky State Police. Damron was released without being charged and the charges against McCoy were eventually dropped. Because of the injuries he received, especially to his back, McCoy was no longer able to work for the Army. He de-enlisted from the Army and the National Guard, and he is currently on disability.

Damron reported Alfrey's beating to investigators. She led them back to the abandoned mine site and showed them the areas of gravel that had been splattered with McCoy's blood and the shards of McCoy's once-prized watch. Alfrey pled guilty to criminal assault charges. McCoy and Damron then brought a § 1983 action against Alfrey claiming that he violated their constitutional rights. After a jury trial held on July 20, 2010, the jury returned a verdict in favor of McCoy and Damron. The jury found that Alfrey unlawfully arrested them without probable cause and used excessive force. The jury awarded McCoy $20,000 in compensatory damages and $250,000 in punitive damages. The jury awarded Damron $0 in compensatory damages and $25,000 in punitive damages. The Court entered judgment on the jury's verdict. Now, Alfrey

4

challenges the award of punitive damages, claiming they are grossly excessive.

## DISCUSSION

Punitive damages punish. A jury may award punitive damages to punish a defendant whose conduct is particularly egregious and to deter others from acting the same way. That is just what the jury did in this case. But sometimes a jury can go too far. Punitive damages that are grossly excessive or arbitrary violate due process. Alfrey contends that the jury in this case went too far. He filed a motion to alter the judgment. R. 96. Resolving this motion requires the Court to answer a simple question: How much is too much?

Alfrey challenges the Court's judgment in two respects. First, he argues that the punitive damages awards to McCoy and Damron were grossly excessive, in violation of his due process rights. Second, he argues that the Court incorrectly awarded prejudgment interest at the rate of twelve percent. For the following reasons, the Court will deny Alfrey's motion with respect to the award of punitive damages and will grant Alfrey's motion to alter the award of prejudgment interest.

I. **Punitive Damages**

The Due Process Clause of the Fifth Amendment constrains a federal court's authority to award punitive damages.[1] Punitive damages are not justified in every case, or even in most

---

[1] Alfrey argues that the award of punitive damages in this case violates the Due Process Clause of the Fourteenth Amendment. That is incorrect. This Court is a *federal* court, and the Fourteenth Amendment only constrains the actions of states. It is the Fifth Amendment's Due Process Clause that constrains a federal court's authority to award punitive damages. Happily for Alfrey, the two Due Process Clauses appear to regulate punitive damages awards in the same manner. Although the Supreme Court's two seminal cases on punitive damages involved state court awards, *see State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 412 (2003); *BMW*

5

cases. Rather, punitive damages are reserved for that special category of cases in which "the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). But a jury cannot go off the deep end in pursuit of punishment or deterrence. Due process prevents a court from awarding punitive damages that are "grossly excessive" or "arbitrary." *Id.* at 416; *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). In *Gore*, the Supreme Court staked out three guideposts for courts to consider in determining whether punitive damages are "grossly excessive" or "arbitrary." Those guideposts are (A) the degree of reprehensibility; (B) the disparity between the harm or the potential harm suffered and the punitive damages award; and (C) the difference between the punitive damages awarded by the jury and the penalties authorized or imposed in comparable cases. *Gore*, 517 U.S. at 575. Applying these guideposts to this case, it is apparent that neither the jury's award of $250,000 in punitive damages to McCoy nor the award of $25,000 in punitive damages to Damron are grossly excessive or arbitrary.

**(A)    Degree of Reprehensibility**

Reprehensibility is the most important factor. *Campbell*, 538 U.S. at 419. The goal of punitive damages, after all, is to punish bad behavior and deter others from engaging in the same behavior. The more reprehensible the behavior, the stiffer the punishment should be. Alfrey's conduct in this case was just about as reprehensible as you can get. As the jury found, he placed

---

*of North Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996), subsequent cases in this and other circuits have relied on the same body of case law in evaluating punitive damages awards in federal court. *See Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 643 (6th Cir. 2005).

McCoy and Damron under arrest without probable cause. He then drove both of them to an abandoned mine where he hauled McCoy out of the car and assaulted him. But that apparently was not enough. After loading McCoy back into the car and driving off, Alfrey brought McCoy and Damron back to the abandoned mine for round two—an even more savage beating. McCoy's injuries required hospitalization. And Damron was forced to watch the entire ordeal.

Alfrey's acts of physical violence towards McCoy make his conduct particularly reprehensible. Other courts have outlined a "hierarchy or reprehensibility," and acts of violence are at the very top. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001) (citing *Florez v. Delbovo*, 939 F. Supp. 1341, 1348-49 (N.D. Ill. 1996)). Beyond the violence, Alfrey's conduct also exhibits many of the other indicia of reprehensibility that the Supreme Court outlined in *Campbell*. 538 U.S. at 419. Alfrey's actions evinced total indifference towards McCoy's physical health; McCoy was vulnerable—unarmed, handcuffed, and entirely at Alfrey's mercy; and Alfrey acted with intentional malice. In short, "[w]hile there is no exchange rate for converting reprehensibility into dollars," *Gibson v. Moskowitz*, 523 F.3d 657, 664 (6th Cir. 2008), the extraordinarily reprehensible nature of Alfrey's actions justify a hefty award of punitive damages for McCoy.

Although Alfrey did not physically assault Damron, his actions towards her nonetheless exhibited a high degree of reprehensibility. As the Sixth Circuit has recognized, "a defendant's conduct can be highly reprehensible without being actually violent." *Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 644 (6th Cir. 2005). The jury found by a preponderance of the evidence that Alfrey arrested Damron without probable cause, drove her out to the abandoned

7

mine, and then savagely beat her boyfriend in front of her. Alfrey's treatment of Damron may be a notch or two lower on the "hierarchy of reprehensibility" than his treatment of McCoy, but it was extremely reprehensible nonetheless.

### (B) Disparity Between Actual Harm and Punitive Damages

The jury awarded McCoy $250,000 in punitive damages and $20,000 in compensatory damages, a ratio of 12.5-to-1. The jury awarded Damron $25,000 in punitive damages and no compensatory damages. In neither case is the disparity between actual harm and the punitive damages so large as to render the award of punitive damages grossly excessive.

In light of the extraordinary reprehensibility of Alfrey's conduct, the 12.5-to-1 ratio between McCoy's punitive and compensatory damages is not grossly excessive. The Supreme Court has expressly declined to "impose a bright-line ratio which a punitive damages award cannot exceed." *Campbell*, 538 U.S. at 425. Although the Court in *Campbell* stated that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," *id.*, the ratio in this case does not exceed single digits "to a significant degree." The Court in *Campbell* was expressing its concern with truly shocking ratios, such as those that it invalidated in *Gore*, 517 U.S. at 583 (500-to-1), and *Campbell* itself, 538 U.S. at 429 (145-to-1). The 12.5-to-1 ratio in this case is not even in the same ballpark. Further, the Supreme Court also emphasized in *Campbell* that higher ratios comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages." *Id.* at 425. The Court recognized that tethering the permissible amount of punitive damages too tightly to the award of compensatory damages would be unwise.

Consider the case of a doctor who rapes a patient under sedation. Because the patient was not conscious during the ordeal her compensatory damages could be relatively minimal, say $1,000. But conduct so reprehensible surely warrants more than $10,000 in punitive damages. The same is true here. Because Alfrey's conduct was so reprehensible, a somewhat higher ratio is warranted. Accordingly, the disparity between McCoy's punitive and compensatory damages does not render the punitive damages grossly excessive.

Neither was the jury's award of $25,000 in punitive damages to Damron grossly excessive. Unlike McCoy, Damron did not receive any compensatory damages. But the absence of compensatory damages does not prevent the jury from awarding punitive damages in a § 1983 case. *See Biver v. Saginaw Twp. Cmty. Sch.*, No. 88-1667, 1989 WL 74654, at *4 (6th Cir. 1989); *see also King v. Macri*, 993 F.2d 294, 299 (2d Cir. 1993); *Glover v. Ala. Dept. of Corrections*, 734 F.2d 691, 694 (11th Cir. 1984), *rev'd on other grounds*, 474 U.S. 806 (1985). Because compensatory damages and punitive damages serve entirely different purposes, the absence of one does not preclude the other. *See Carlson v. Green*, 446 U.S. 14, 22 n.9 (1980) ("[P]unitive damages may be the only significant remedy available in some § 1983 actions where constitutional rights are maliciously violated but the victim cannot prove compensable injury."). Even if the plaintiff is not physically injured and therefore does not require any damages to be made whole, the jury may still impose punitive damages on the defendant as punishment for reprehensible conduct and to deter similar conduct in the future. As the Eleventh Circuit has recognized, "[t]he need for deterrence or punishment should not vary with the success of the assault." *Glover*, 734 F.2d at 694.

And § 1983 cases are a special breed. It is not easy to translate constitutional violations into dollars and cents. *See Carlson*, 446 U.S. at 22 n.9. For this reason, compensatory damages in many § 1983 cases are either quite small or nonexistent. Indeed, § 1983 cases often involve "particularly egregious act[s]" that "result[] in only a small amount of economic damages." *Campbell*, 538 U.S. at 425. But that does not stop juries from imposing hefty punitive damages awards where they are warranted. For example, in *Romanski*, the plaintiff filed a § 1983 action against a casino after she was unlawfully detained and intimidated by security personnel. 428 F.3d at 634. The jury awarded her $279.05 in compensatory damages. *Id.* at 635. Based on the egregiousness of the defendants' conduct, the Sixth Circuit approved an award of $600,000 in punitive damages. *Id.* at 649. Because the plaintiff's injuries—invasion of her constitutional rights—were "without a ready monetary value," a "higher ratio[] between the compensatory or nominal award and the punitive award" was justified. *Id.* at 645. Similarly, in this case, it is difficult to monetize Alfrey's violation of Damron's constitutional rights. But given the extraordinary reprehensibility of Alfrey's conduct—he arrested Damron without probable cause, carted her off to an abandoned mine, and savagely beat her boyfriend right in front of her, twice—the jury's award of $20,000 in punitive damages was not grossly excessive. Accordingly, it did not violate due process.

**(C)    Difference Between Punitive Damages and Penalties Authorized or Imposed in Comparable Cases**

This final guidepost also supports upholding the punitive damages awards in this case. Although Alfrey only pled guilty to fourth degree assault, his conduct would likely constitute several other more serious felony criminal offenses under Kentucky law. *See* KY. REV. STAT.

ANN. §§ 508.010 (first degree assault), 509.040 (kidnapping). In addition to lengthy prison sentences of at least ten years, *see id.* § 532.060(2), Kentucky law also authorizes criminal fines of up to $10,000 for each offense. *See id.* § 534.030. Not only does Kentucky law impose serious penalties on Alfrey's conduct, but prior Sixth Circuit decisions have approved significantly greater punitive damages awards for less reprehensible conduct. *See Romanski*, 428 F.3d at 649 (approving $600,000 punitive damages award for unlawful arrest and detention even though plaintiff was not physically injured). Alfrey has not directed the Court to any cases holding that punitive damages similar to those awarded in this case were grossly excessive under similar circumstances. Accordingly, this third guidepost points the Court in the same direction as the previous two—the punitive damages awards in this case do not violate due process.

In addition to claiming that they are unconstitutional, Alfrey also argues that the punitive damages should be reduced because of his limited financial means. R. 96, Attach. 1 at 5. This argument is too late. The Court instructed the jury that it "may consider" Alfrey's ability to pay in determining the appropriate amount of punitive damages. R. 90 at 25. If Alfrey wanted his liability for punitive damages to be decreased because of his inability to pay, it was his burden to present information on his finances to the jury. *See Johnson v. Howard*, 24 F. App'x 480, 488 (6th Cir. 2001). The Court will not second guess the jury's determination based on Alfrey's simple assertion that the punitive damages will be too difficult for him to pay.

Alfrey's conduct was absolutely reprehensible. He abused his power and mercilessly beat an unarmed man while his girlfriend watched. Police officers have a sacred duty to protect and defend members of the public. Alfrey violated that duty, and the citizens' trust, in the most

troubling way. His actions cast an unwarranted shadow over other police officers. If there was ever conduct that deserved punishment, this is it. If there was ever behavior that required the utmost deterrence, this is it. The jury's award of $250,000 in punitive damages to McCoy and $25,000 in punitive damages to Damron was not grossly excessive and did not violate due process. Accordingly, Alfrey's motion to alter the judgment with respect to the punitive damages will be denied.

## II.  Prejudgment and Postjudgment Interest

The Court awarded McCoy and Damron prejudgment interest and postjudgment interest at a rate of twelve percent per annum in the judgment entered on August 3, 2010. R. 95. The Court awarded interest in this amount after directing the parties to file proposed judgments including prejudgment and postjudgment interest rates. R. 93. Only McCoy and Damron submitted a proposed judgment; Alfrey did not. The Court therefore entered judgment in accordance with McCoy and Damron's proposal. Now, in his motion to amend the judgment, Alfrey objects to the award of prejudgment interest. R. 96, Attach. 1 at 6-9. Alfrey first argues that the Court is precluded from awarding prejudgment interest because McCoy and Damron did not submit their claim for prejudgment interest to the jury. *Id.* at 7. In the alternative, Alfrey argues that the Court erred by awarding prejudgment interest on both the compensatory and punitive damages at a rate of twelve percent. Instead, Alfrey contends that the rate should be eight percent and the interest should only apply to the compensatory damages, not to the punitive damages. *Id.* at 8-9.

Should McCoy and Damron receive prejudgment interest in this case? Because they

brought this action under § 1983, federal law determines their entitlement to prejudgment interest. *See Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 986 (6th Cir. 2000). This is in contrast to diversity cases, in which state law governs the award of prejudgment interest to the prevailing party. *See Diggs v. Pepsi-Cola Metro. Bottling Co.*, 861 F.2d 914, 924 (6th Cir. 1988). Courts have developed federal common law rules for determining whether a prevailing plaintiff is entitled to prejudgment interest on federal law claims. *See Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir. 1998). In the Sixth Circuit, awarding prejudgment interest is within the sound discretion of the trial court. *See Green v. Nevers*, 196 F.3d 627, 633 (6th Cir. 1999); *Young v. Langley*, No. 87-1446, 1988 WL 12805, at *1 (6th Cir. 1988).

In support of his argument that McCoy and Damron waived prejudgment interest because they did not submit their claim for it to the jury, Alfrey cites to a case from the First Circuit. R. 96, Attach. 1 at 7 (citing *Furtado v. Bishop*, 604 F.2d 80 (1st Cir. 1979)). In *Furtado*, the First Circuit held that failure to submit a claim for prejudgment interest to the jury waives the plaintiff's right to recover it. 604 F.2d at 98. Because the court deemed prejudgment interest to be discretionary the court held, as a matter of federal common law, that claims for prejudgment interest must be submitted to the jury. *Id*. That may be the common law rule in the First Circuit, but it is not the rule in the Sixth Circuit. Alfrey has not cited any cases from the Sixth Circuit holding that a plaintiff must submit his claim for prejudgment interest to the jury. And the Sixth Circuit has affirmed prejudgment interest awards on federal law claims where the issue of prejudgment interest was not submitted to the jury. *See, e.g.*, *Ford*, 154 F.3d at 619. In this Circuit, an award of prejudgment interest is left to the sound discretion of the trial court.

13

*Rybarczyk*, 235 F.3d at 986. Accordingly, if prejudgment interest is warranted, the Court may award it even though the plaintiff did not submit his request to the jury.

Is prejudgment interest appropriate in this case? Yes. The purpose of prejudgment interest is to "compensate the plaintiff for the delay between the time the cause of action arose and the verdict." *Conte v. General Housewares Corp.*, 215 F.3d 628, 640 (6th Cir. 2000). In this case, the plaintiffs were injured on July 3, 2007. The Court entered judgment on August 3, 2010. The plaintiffs were entitled to damages for their injuries for the more than three years between the date of the injury and the date of the judgment. An award of prejudgment interest compensates them for the lost use of the funds during this time. Accordingly, awarding prejudgment interest serves the goal of making the plaintiffs whole and "remedy[ing] the injury giving rise to the underlying action." *Osterneck v. Ernst & Whitney*, 489 U.S. 169, 176 n.3 (1989) (internal citation and quotation omitted). The Court's award of prejudgment interest was proper.

That leaves three questions remaining. Does prejudgment interest apply to both the compensatory and the punitive damages or only to the compensatory damages? What is the appropriate interest rate? And on what date did the prejudgment interest start to accrue? Alfrey argues that prejudgment interest should only be awarded on the compensatory damages, that the appropriate interest rate is eight percent per annum, and that the onset date is the date of the injury, July 3, 2007. R. 196, Attach. 1 at 8-9. McCoy and Damron agree. R. 97. Accordingly, the Court will amend the judgment to award prejudgment interest at a rate of eight percent per annum on McCoy's compensatory damages only, accruing from July 3, 2007, to the date of the

14

judgment.

The Court also awarded McCoy and Damron postjudgment interest at a rate of twelve percent per annum. The Court calculated this rate utilizing a Kentucky statute setting the postjudgment interest rate at twelve percent. R. 95 (citing Ky. Rev. Stat. § 360.040). Although Alfrey did not challenge the award of postjudgment interest, after reviewing the judgment and the applicable law, the Court realizes that it applied the incorrect postjudgment interest rate. Federal law, not state law, controls postjudgment interest. *Estate of Riddle ex rel. Riddle v. Southern Farm Bureau Life Ins. Co.*, 421 F.3d 400, 409 (6th Cir. 2005). A federal statute, 28 U.S.C. § 1961, provides that postjudgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." The statute also provides that postjudgment interest shall be "computed daily to the date of payment" and "compounded annually." *Id.* § 1961(b). Applying this formula, the appropriate postjudgment interest rate is 0.30%. That is the weekly average 1-year constant maturity Treasury yield, published by the Board of Governors of the Federal Reserve System, for the week preceding the Court's judgment entered on August 3, 2010. Accordingly, the Court will *sua sponte* alter the amount of postjudgment interest awarded to McCoy and Damron to conform to the correct federal rate.

## CONCLUSION

For these reasons, it is **ORDERED** as follows:

(1) Alfrey's motion to alter, amend, or vacate the judgment, R. 96, is

15

**GRANTED IN PART** and **DENIED IN PART**. In particular, Alfrey's motion to alter the award of prejudgment interest is **GRANTED** and his motion to reduce the amount of punitive damages awarded to McCoy and Damron is **DENIED**.

(2) Alfrey shall pay McCoy prejudgment interest on his compensatory damages at a rate of eight percent per annum for the period from July 3, 2007, to August 3, 2010.

(3) Alfrey shall pay McCoy and Damron postjudgment interest at a rate of 0.30% per annum, compounded annually.

(4) The Court will enter an amended judgment contemporaneously with this opinion.

This the 28th day of October, 2010.

Signed By:
*Amul R. Thapar* AT
United States District Judge